## APPEAL OF EDWARD A. LANGENBACH.

Docket No. 2131.   Submitted June 10, 1925.   Decided October 5, 1925.

In the financial reorganization of a business, all of the assets and property of a corporation were transferred for a cash consideration to a new corporation of another State, organized for the purpose of taking over the business. Upon receipt of the cash the corporation declared a dividend of the amount of its surplus, and the taxpayer received such dividend upon shares of stock held by him. He then transferred his shares to the new cor-

poration and received the par value thereof in cash. The sums so received as dividends and in payment for his shares were immediately paid over by the taxpayer for shares in the new corporation. *Held*, under the Revenue Act of 1916, that the taxpayer is subject to surtaxes on the amount of the dividends, and to normal and surtaxes on the gain or profit realized on the shares transferred.

*David B. Day, Esq., Thomas E. Wing, Esq.*, and *H. A. Mihills, C. P. A.*, for the taxpayer.

*Marion N. Fisher, Esq.*, for the Commissioner.

Before STERNHAGEN, GREEN, and LOVE.

The taxpayer appealed from the determination of a deficiency of $50,932.27 in income taxes for the year 1916. The error assigned is the inclusion in income of the alleged profit resulting from the disposition of shares of capital stock which the taxpayer claims were exchanged in a corporate reorganization for other shares representing the same capital interest.

The following quotation from the statement accompanying the deficiency letter shows the basis used by the Commissioner in arriving at his determination:

Your taxable profit from sale of stock of the United Steel Company computed in accordance with the recommendation of the Committee on Appeals and Review, is $570,179.36. The computation is as follows:

| | |
|---|---:|
| Amount distributed in liquidation | $1,066.66⅔ |
| Value per share at March 1, 1913 | 441.47 |
| Profit per share in liquidation | 625.19⅔ |
| Number of shares 912—$625.19⅔×912=$570,179.36. | |
| The taxable net profit on transaction | 570,179.36 |

FINDINGS OF FACT.

On October 25, 1916, the taxpayer was the owner of 912 shares of the capital stock of the United Steel Co., and he then was and for some time prior thereto had been the president and a member of the board of directors of the company and its largest stockholder.

The United Steel Co. is an Ohio corporation, organized by the taxpayer and others in 1902, and was engaged in the manufacture of alloy steel for automobile parts. In 1916 its outstanding capital stock was $1,500,000, consisting of 15,000 shares of the par value of $100 each. The company had been successful and most of its earnings were left in the business, so that in 1916 the capital and surplus was over $7,000,000, or between $400 and $500 a share. For three or four years prior to that year the average earnings were in excess of $2,000,000.

In 1916 the United Steel Co. required additional capital for expansion, and it needed recapitalization and refinancing. It required

$4,000,000 of new capital to provide for the growth of the business. There were between 200 and 300 stockholders, which the taxpayer thought were too many for practical discussion of the problem. The taxpayer, on behalf of the corporation, had negotiations with Hornblower & Weeks relating to the raising of additional capital. In these negotiations it was agreed between the taxpayer and Hornblower & Weeks that, if the latter would undertake the proposed refinancing and recapitalization, the taxpayer would continue his connections with the business, and he and his principal associates in the business would continue as stockholders to the extent of not less than 30 per cent of the stock issued on the reorganization. The following agreement between the corporation and Hornblower & Weeks was made:

This agreement made this 29th day of September, 1916, by and between The United Steel Company, an Ohio corporation having its principal place of business at Canton, Ohio, hereinafter called the "Company", party of the first part, and Hornblower & Weeks, a co-partnership doing business as bankers and brokers at No. 42 Broadway in the City of New York, hereinafter called the "Purchasers", party of the second part, witnesseth:

Said parties, in consideration of the payment by the Purchasers to the Company of the sum of One Dollar ($1.00), the receipt whereof is hereby acknowledged, and in consideration of the mutual stipulations herein contained have agreed as follows:

The Company agrees to sell and deliver and the Purchasers agree to take and pay for the entire property and assets of the Company as a going concern at the purchase price of Sixteen Million Dollars ($16,000,000) in cash which is to be paid by the Purchasers at the office of the Company at Canton, Ohio, on the 25th day of October at 12 o'clock noon (or at such other date as the President or Board of Directors of the Company and said Purchasers may agree upon) and upon delivery at the same time and place to the Purchasers of good and sufficient deeds and transfers conveying to the Purchasers or their nominees marketable title to all such property and assets.

The Purchasers, as part consideration for the said property and assets, agree that they will upon said date of transfer by a good and sufficient covenant in writing assume and agree to pay all the outstanding debts and obligations of the Company and assume the performance of all contracts of the Company as of the date of transfer, it being understood that until such transfer the financial and physical condition of the Company shall not be changed except in the ordinary course of business and except by the dividends declared on the date hereof by the Board of Directors upon the stock of the Company.

This agreement is conditional on the same being adopted at a meeting of the stockholders of the Company to be called for the purpose of considering the same in accordance with the General Code of the State of Ohio on such subject.

This agreement was duly approved by the board of directors and executed on behalf of the corporation on September 29, 1916. It was executed by Hornblower & Weeks and delivered on October 2, 1916, and was duly approved by the stockholders of the corporation on October 14, 1916.

At the same time that the above agreement between the corporation and Hornblower & Weeks was executed by the latter, the taxpayer delivered to Hornblower & Weeks a letter and received an acknowledgment of the same, dated the following day, both of which are set out below:

OCTOBER 2, 1916.

Messrs. HORNBLOWER & WEEKS,
          *42 Broadway, N. Y. City.*

DEAR SIRS: Referring to your contract dated September 29, 1916 with the United Steel Company I understand that you propose turning this property together with $4,000,000 additional cash working capital into a new corporation having 525,000 shares of stock (and no other capital securities upon organization) of which 25,000 shares is to be reserved in the treasury for employees under appropriate arrangements. Of the remaining 500,000 shares I agree to purchase and take 200,000 shares at $42.50 each.

It is my further understanding that of this 200,000 shares so purchased by me I shall have the privilege of putting to you all or any part of 50,000 shares until noon on October 17, 1916, at $42.50 per share.

It is also understood that the above 200,000 shares are not to be sold during the life of your Syndicate on the balance of the stock.

          Yours very truly,

E. LANGENBACH.

OCTOBER 3, 1916.

Mr. EDWARD LANGENBACH,
          *% United Steel Co., Canton, Ohio.*

DEAR SIR: This is to confirm letter which you have this day given us regarding your purchase of 200,000 shares of the new securities of the new United Alloy Steel Company.

          Yours very truly,

HORNBLOWER & WEEKS.

The machinery of the transaction as finally arranged between the taxpayer and Hornblower & Weeks, and carried out, was as follows:

(*a*) A contract between the old company (the United Steel Co.) and Hornblower & Weeks (the contract dated September 29, 1916, set forth above).

(*b*) The organization by Hornblower & Weeks of a new corporation named the United Alloy Steel Corporation (hereinafter called the new company) under the laws of the State of New York, with an authorized capital stock of 525,000 shares without par value, of which 25,000 shares were reserved in the treasury for sale to employees.

(*c*) The designation by Hornblower & Weeks of the new company to receive the assets of the old company.

(*d*) A contract between Hornblower & Weeks and the new company to deliver the assets of the old company and $4,000,000 of additional cash to the new company, in exchange for 500,000 shares of its capital stock.

(e) An agreement between Hornblower & Weeks and the taxpayer whereby the latter was permitted to and agreed to purchase 200,000 shares of the new stock, with the right to resell to Hornblower & Weeks at the same price within a limited period, 50,000 of such shares.

(f) The sale to the public by Hornblower & Weeks through an underwriting syndicate of 200,000 shares.

(g) The completion of the organization of the new company by election of the same officers and a part of the same directors as the old company, with the addition to the board of directors of four new members nominated by Hornblower & Weeks, on a board of nine directors.

(h) The continuation of the business by the new company precisely as left by the old company upon closing the transaction without change or interruption of operation, management, or personnel.

On October 23, 1916, the board of directors of the old company, in anticipation of the receipt of $16,000,000 under the contract of September 29, 1916, adopted the following preambles and resolutions:

Whereas the contract heretofore entered into under authority of the Board of Directors with Hornblower & Weeks for the sale of the entire property and assets of the corporation as a going concern, subject to its liabilities, for the sum of Sixteen Million Dollars ($16,000,000) in cash was adopted at a meeting of the stockholders held on the 14th day of October, 1916, all as appears from the record of the Directors meeting held on the 29th day of September and the stockholders meeting on the 14th day of October, 1916; and

Whereas said contract is to be closed on October 25, 1916, and upon appropriate transfer of the property and assets of the corporation there is to be paid therefor into the treasury of this company the purchase price of Sixteen Million Dollars ($16,000,000) in cash; and

Whereas upon such transfer and payment the sole asset of this company will consist of Sixteen Million Dollars ($16,000,000) in cash; now, therefore, be it

Resolved, that upon receipt in the treasury (and not otherwise) on October 25, 1916, of the sum of Sixteen Million Dollars ($16,000,000) there be and there is hereby declared a dividend of Nine Hundred and Sixty-six Dollars and Sixty-six and two-thirds Cents ($966.66⅔) per share upon the capital stock of this company (payable on October 25, 1916, or if said cash shall not be received in the treasury of the Company until later than October 25th, 1916, then payable on the date of the receipt thereof).

Further resolved, that pursuant to this resolution, the Treasurer of this Company be and he hereby is authorized and directed to distribute and to pay to the stockholders of this company on October 25, 1916, (or on the day of the receipt in the treasury of said Sixteen Million Dollars ($16,000,000) in cash) said cash dividend at the rate of Nine Hundred and Sixty-six Dollars and Sixty-six and two-thirds Cents ($966.66⅔) per share of stock.

At a meeting held on October 25, 1916, the new company, in the following statement and resolution, authorized the purchase from the stockholders of the shares of the old company:

The President reported that the directors of The United Steel Company of Canton, Ohio, anticipating that this company after acquiring all the property and assets of the Canton Company would also desire to acquire the capital stock thereof, namely, 15,000 shares of the par value of $100 each in order to preserve the name and organization, had declared a dividend payable forthwith of $966.66 per share and had requested their stockholders to send in their certificates duly assigned for transfer to the First National Bank of Canton, Ohio, with instructions to deliver the same after receipt for each share of said dividend of $966.66 from the Canton Company and $100 from this company. The President further explained that after the payment of said dividend there would remain in the treasury of the Canton Company in cash exactly $100 per share so that the payment of $100 per share would involve no actual cost.

On motion duly seconded it was

*Resolved*, That the officers of this company be and they are hereby directed to purchase all shares of stock in said The United Steel Company of Canton, Ohio, paying therefor $100 per share against deliveries of certificates but not to purchase any of said shares until at least a majority of those outstanding can be so purchased.

The taxpayer, for the purpose of the transaction, took over the shares of his associates and for himself, and then he caused to be issued to himself a single certificate of 7,619 shares of stock in the old corporation, representing the holdings of all of them.

The transaction was closed on October 25, 1916. The taxpayer and others representing the old company met with representatives of the new company and of Hornblower & Weeks, at the office of the Guaranty Trust Co. in New York City. The old company delivered appropriate deeds, bills of sale, and other instruments necessary to transfer its entire property and assets, subject to its liabilities, to the new company as the nominee of Hornblower & Weeks, and received from Hornblower & Weeks $16,000,000. The new company received from Hornblower & Weeks $4,000,000 in cash, and delivered to them proper certificates for 500,000 shares of its capital stock. Hornblower & Weeks delivered proper certificates for 200,000 shares to the taxpayer, and received from the taxpayer therefor $8,500,000. At the closing he borrowed $8,500,000 from the Guaranty Trust Co. with which to pay for 200,000 shares of stock of the new company; and, as collateral, he deposited the certificate for 7,619 shares of stock of the old company, and Hornblower & Weeks deposited certificates for 200,000 shares of the new company. At the same time the taxpayer received a check of the old company for $7,365,033.37, representing the dividend of $966.66⅔ on the 7,619 shares; and he received a check of the new company for $761,900, representing the purchase price of the

7,619 shares of the old company at par. He then drew his personal check for $373,066.63 to the order of the Guaranty Trust Co., and delivered it with the other two checks mentioned, properly endorsed, to that company in repayment of the loan, the three checks aggregating $8,500,000. The Guaranty Trust Co. then returned his note and the collateral, and the taxpayer endorsed and delivered to the new company the certificate for 7,619 shares in the old company.

The dividend of $966.66⅔ per share was paid to all of the other stockholders of the old company. After the payment of the dividend upon all of the shares, there remained in the treasury of the old company $1,500,000. The new company acquired all of the shares of the old company at par, or for an aggregate payment of $1,500,000. On November 24, 1916, the par value of the shares of the old company was reduced from $100 to $1 per share, or a total of $15,000; and the corporation has been kept alive solely for the purpose of preventing others from using the name.

The taxpayer did not avail himself of the right contained in the agreement with Hornblower & Weeks to resell to them 50,000 shares.

The new corporation received $40 per share for its stock. The shares were sold to the public at $45 each and the taxpayer paid $42.50 per share for the 200,000 shares issued to him. The differences of $5 and $2.50, respectively, were a profit or premium to Hornblower & Weeks. After the reorganization, in place of his 912 shares of the old company, the taxpayer had 22,889 shares of the new company. His ratio of interest in the old company was 6.08 per cent; in the new, 4.578 per cent. The 7,619 shares of the old company held by the taxpayer for himself and others represented 52.746 per cent of the outstanding stock. The 200,000 shares of the new corporation which he received represented 40 per cent of the outstanding stock. The taxpayer has never reduced his holdings in the new company below 22,889 shares.

The shares of the old company on March 1, 1913, had a value of $441.47.

### DECISION.

The deficiency should be computed in accordance with the following opinion, and will be settled on consent or on 15 days' notice, under Rule 50.

### OPINION.

STERNHAGEN: The taxpayer urges us to look to substance and not to form, contending that in substance he merely changed the evidence of his capital interest in the business without realizing income. At the completion of the reorganization his stock in the new corporation represented, he contends, approximately the same propor-

tionate interest in the same assets, and in this situation the intermediate facts leading to this result are matters of form which should not control the determination of taxable income. The Commissioner insists that each step is a matter of substance, and that the moment the taxpayer received for his stock more than its value on March 1, 1913, he realized taxable income notwithstanding his obligation to continue his interest in the business and his subsequent use of the proceeds in the acquisition of stock in the new corporation. Both parties rely upon decisions of the Supreme Court.

The argument that we must regard substance and not form is elusive, for its adoption leaves us confronted with the equally difficult task of distinguishing form from substance. The taxpayer here with his associates was primarily concerned with the need of securing new capital for the business. In order to accomplish this it was necessary for financing reasons to organize a new corporation with stock of no par value; and this could not be done under the laws of Ohio. The corporation was organized in New York with new directors and additional capital. These two corporations were essentially different, and it is only by recognizing them as essentially different that the new organization can be explained. Were it not so, why were such meticulous efforts made to adhere to the program of reorganization?—the stockholders' authorization in Ohio, the solemn declaration of a dividend and its actual payment by check, the borrowing against it by the taxpayer from the trust company, and the deposit of certificates and issuance of the checks, the separate sale by the taxpayer of his old shares and the receipt of the separate check as the purchase price? These acts were the validating and enabling acts by which the plan was fulfilled. They were important in that they were essential to the reorganization of the business. Because they were all related to the whole plan, as they undoubtedly were, it can not be said that each was not substantial. The parties were under no legal compulsion to adopt this method or perform these acts. They voluntarily chose the plan and presumably undertook all the obligations it entailed, including State and Federal taxes. Surely the State of New York would have been deaf to a plea for exemption from organization fees or franchise tax on the ground that the new corporation was a mere form and not a matter of substance.

The taxpayer cites *Weiss* v. *Stearn*, 265 U. S. 242, as an authoritative disposition of a similar problem. We think it is not controlling here, not only because we have a new corporation of a different State from the old, but also because there is a substantial difference in the new no-par-value stock from the old par-value stock, *Paul* v. *Pacific Development Corporation*, 197 N. Y. S. 811; and, further, because here the taxpayer actually received a cash dividend and not, as there,

a direct exchange of stock. The more recent decision in *Marr* v. *United States*, 268 U. S. 536, is in our opinion more nearly in point, for the exchange of stock in that case being a taxable transaction, *a fortiori* the receipt of cash here is taxable. The taxpayer also cites *Eisner* v. *Macomber*, 252 U. S. 189, in which stock dividends were held not to be income. But in that case the court made clear the opinion that a cash dividend, even although used immediately to purchase new stock, would be taxable.

In *United States* v. *Phellis*, 257 U. S. 156, and *Rockefeller* v. *United States*, 257 U. S. 176, the court considered situations where the stockholder received, not cash, but stock in a new corporation holding some of the same assets which the old stock had theretofore represented; and the stockholder was held taxable upon the value of the stock thus received as a dividend, notwithstanding that the new stock was part of a reorganization. In those cases the stockholders urged that they were merely receiving new symbols of ownership of the same interest their right in which had never changed and never come to realization; but this the court declined to adopt. Here the corporation declared and the stockholder received a *cash* dividend, which, were it not for his voluntary contract, he had under his complete dominion. At the moment of its receipt he realized income, and what he did with it thereafter, irrespective of how soon, can not change its character at that time. *Appeal of Regal Shoe Co.*, 1 B. T. A. 896; *Appeal of E. C. Huffman*, 1 B. T. A. 52.

It is our opinion, therefore, that the taxpayer can not escape tax because the amounts received were incidental to the reorganization. The Commissioner, however, stands in an equivocal position. Defending the tax on the ground that each step in the reorganization is independent of the others, he nevertheless treats the dividend of $966.66⅔ per share and the sale of each old share to the new corporation for $100 as a single act in liquidation. He then compares the $1,066.66⅔ per share so received with the agreed March 1, 1913, value of $441.47 and treats the difference as taxable gain. But the amount of $966.66⅔ was a dividend on each share in ordinary course, duly covered by corporate resolution distributing only the corporation's surplus. By the Revenue Act of 1916, section 1 (b), such dividend was subject in the hands of the receiving stockholder to the surtax only. This amount on his 912 shares, or $881,600, was all that this taxpayer received from the old corporation. After the payment of this dividend out of its surplus the old corporation still had its capital stock of $1,500,000, represented by 15,000 shares of $100 par value. Of these the taxpayer sold his 912 shares to the new corporation at par. This had nothing to do with the old corporation. It was not a liquidation distribution, for that corporation was neither liquidating nor dissolving at that time. What it did

later by way of reducing its capital was of no concern to this taxpayer, who was no longer a stockholder. The sale price of $100 a share, or $91,200, resulted in gain or loss, the measure of which depended upon the original cost and March 1, 1913, value of the shares. *Goodrich* v. *Edwards*, 255 U. S. 527; *United States* v. *Flannery*, 268 U. S. 98. We have the value on March 1, 1913, stipulated at $441.47, but this alone is not determinative, and there is in the record no evidence of original cost. The deficiency must be recomputed by imposing surtax upon the $881,590 of dividends, and both normal and surtax upon the gain derived from the disposition of the shares for $91,200.

ARUNDELL not participating.